# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DIANA TORRES APARICIO, | Case No. 1:18-cv-00777-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | (Doc. 1) |

_____/

## I.    INTRODUCTION

On June 6, 2018, Plaintiff Diana Torres Aparicio ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

///

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 9, 10.)

## II.     FACTUAL BACKGROUND

On February 26, 2015, Plaintiff protectively filed an application for DIB payments, alleging she became disabled on November 21, 2015[2] due to a back injury. (Administrative Record ("AR") 18, 20–21, 73, 83, 208–211, 222.) Plaintiff was born on November 21, 1965 and was 50 years old on the alleged onset date. (AR 27, 37–38, 73, 83, 208, 218, 259, 268.) She has a high school education. (AR 27, 42–43.) Plaintiff has past work experience from 2000 to 2014 as a pharmacy clerk. (AR 26, 60–61, 233.)

### A.     Relevant Medical Evidence[3]

#### 1.     Charles F. Xeller, M.D.

In June 2012, prior to her alleged onset date, Plaintiff injured herself at work when she fell backwards in a chair that broke. (AR 308, 617). In a report dated January 6, 2013, orthopedic surgeon Dr. Charles F. Xeller noted Plaintiff complained of ongoing pain in the midline of her back. (AR 617–18.) Dr. Xeller indicated his belief that Plaintiff suffered a compression fracture of the thoracic spine and stated that Plaintiff "could work" but needed to minimize heavy repetitive lifting. (AR 617.) He opined that over-the-counter anti-inflammatory medication would be appropriate to treat her pain. (AR 617.)

X-rays of Plaintiff's lumbar spine performed July 25, 2013, showed "[m]ild L5-S1 degenerative disk disease," "[m]ultilevel bilateral mild facet arthrosis," and "sclerotic marginated . . . mild anterior compression deformities of L2, L1, T12, and T11." (AR 834–35.) On November 18, 2013, Plaintiff presented with ongoing pain in her mid and lower back. (AR 641.) She was assessed with a lumbar back strain and treated with medication. (AR 642.) Plaintiff was also restricted from pushing or pulling over 10 pounds. (AR 642.)

During a physical examination on December 13, 2013, Plaintiff was observed to be "sitting comfortably" and was able to ambulate without assistance, discomfort, or distress. (AR 630–31.) She was prescribed Tramadol and advised to continue with no lifting, pushing, or pulling greater

---

[2] Plaintiff's original alleged onset date was January 8, 2014; at the hearing, she amended her alleged onset date to November 21, 2015. (AR 37–38, 73, 83, 208–211, 222.)

[3] As Plaintiff's assertions of error is limited to the ALJ's assessment of the medical opinion evidence with respect to Plaintiff's physical impairments and the resultant formulation of Plaintiff's RFC (Doc. 16 at 12–18; Doc. 21 at 2–5), only evidence relevant to those arguments is set forth below.

than 10 pounds. (AR 631.) On December 20, 2013, Plaintiff underwent bilateral lumbar facet joint injections to treat her lumbar radiculopathy, lumbar neuralgia, myofascial pain syndrome, and lumbar disk herniation. (AR 621–27.)

**2.    Marc D. Johnson, M.D.**

On January 3, 2014, Plaintiff presented to Dr. Marc D. Johnson complaining of pain in her low back rated "7/10." (AR 614.) Examination of Plaintiff's back showed she was able to walk on her heels and toes with no pain. (AR 614.) Dr. Johnson observed that tilting caused pain in the left and middle. (AR 614.) Plaintiff's straight leg raise tests were normal and she was able to ambulate without assistance, discomfort, or distress. (AR 614.) Dr. Johnson assessed Plaintiff with low back pain, "[d]isk protrusions," "fissure of the annulus L4-L5 and L5-S1," and "sprain of the intraspinatus ligaments." (AR 615.) Dr. Johnson referred Plaintiff for chronic pain management and requested a TENS unit. (AR 615.)

On January 8, 2014, Plaintiff claimed she re-injured her low back while lifting ice cream containers at work. (AR 610.) Upon examination, she appeared to be in discomfort with moderate tenderness noted in her lumbar spine. (AR 611.) Plaintiff had normal range of motion and strength. (AR 611.) She was diagnosed with a back strain and back pain and was prescribed Flexeril, Zofran, and Dilaudid. (AR 612.)

Plaintiff presented to Dr. Johnson on January 24, 2014, with "aggressive" and "worsening" pain that causes stiffening and radiates to her extremities. (AR 590.) Dr. Johnson observed her "sitting uncomfortably in pain" and "guarding her hip due to pain." (AR 591.) Upon examination, Plaintiff had tenderness and a pulling sensation radiating to her right lower extremity. (AR 591.) Dr. Johnson prescribed medications and recommended sacroiliac injections. (AR 591.) He also indicated Plaintiff could return to modified work, with no lifting, pushing, or pulling over 10 pounds, and no repetitive climbing, bending, or prolonged stooping. (AR 591.) Dr. Johnson also limited Plaintiff to 6-hour shifts. (AR 591.)

On February 10, 2014, Dr. Johnson assessed Plaintiff with a possible T12-L1 fracture and administered a Toradol shot for pain. (AR 585.) He also recommended professional pain management treatment as the "treatment is likely just the pain management and time." (AR 585.)

On March 10, 2014, Plaintiff presented to Dr. Johnson with lumbar pain rated "7/10." (AR 583.) Upon examination, Plaintiff had limited range of motion in her lumbar spine but was able to heel-toe walk and stand on one foot without difficulty. (AR 583.) No antalgic gait was noted, but Plaintiff needed to "push off from the chair" to assume a standing position. (AR 583.) Dr. Johnson refilled Plaintiff's prescriptions and kept her on modified work status with restrictions to include no lifting, pushing, or pulling over 10 pounds, and no repetitive bending or stooping. (AR 583.) He also limited her to a 6-hour work shift. (AR 583.)

An x-ray of Plaintiff's lumbar spine taken April 1, 2014, showed "9 degree dextroscoliosis," "Schmorl's node superior endplate body of L1," "[d]egenerative changes with disc space narrowing [at] L1-2, L2-3, and L5-S1, and osteophyte formation [at] L1-2," and "[s]table 0.3 cm retrolisthesis of L2 on L3, without instability at other levels." (AR 550, 576.) Magnetic resonance images (MRIs) of the lumbar spine taken that same day showed "[m]ild disk desiccation with a 2 mm right-sided disk protrusion noted at the L4-L5 level" and "[d]isk desiccation with a 3 mm central and slightly right-sided disk extrusion noted at the L5-S1 level." (AR 548–49, 572–73.) No thecal sac or nerve root compression was seen. (AR 548–49, 572–73.) A bone scan performed April 7, 2014, showed no abnormalities. (AR 574.)

On April 10, 2014, Dr. Johnson reviewed Plaintiff's objective testing and assessed Plaintiff with "annular fissures of the lumbar spine disk" and "fatty atrophy of the spinous muscles." (AR 544.) He continued Plaintiff on a muscle relaxer and pain reliever and recommended that she use a cane for assistance. (AR 544.) On April 14, 2014, computed tomography (CT) scan of Plaintiff's thoracic spine revealed "2 mm central disk protrusions at the T8-T9, T9-T10, and T11-12 levels. (AR 426–27, 534–35, 542–43.)

Plaintiff presented to Dr. Johnson's office on May 13, 2014, with pain in her lower back that is "worse when the weather changes or if she twists or lifts." (AR 421–22.) Examination of Plaintiff's lumbar spine showed difficulty on flexion, extension, lateral bending, and lateral rotation. (AR 422.) Dr. Johnson assessed Plaintiff with lumbar spine strain and sacroiliitis, and recommended Tramadol for pain, a 10-pound lifting limit, and a 6-hour workday limitation. (AR 422.)

On June 24, 2014, Plaintiff was seen by Dr. Johnson's office for pain rated "5/10." (AR

416.) Clinical observations included limited range of motion in Plaintiff's lumbar spine. (AR 417.) Plaintiff reported feeling "unstable" in attempting to heel-toe walk but was able to balance on one foot without difficulty. (AR 417.) No antalgic gait was noted. (AR 417.) She was assessed with chronic lumbar radiculitis at the S1 nerve root and a lumbar spine sprain. (AR 417.) Plaintiff was provided medication refills and recommended to remain on "temporary alternate work status" with restrictions of no lifting, pushing, or pulling over 10 pounds. (AR 418.)

Plaintiff presented to Dr. Johnson's office on October 23, 2014, for a medication refill. (AR 477.) She complained that she is "continuing to have radiating pain from her mid back to her sacrum with intermittent radiation to her bilateral posterior legs extending to the knee." (AR 477.) Plaintiff also complained of "periodic numbness extending to her buttocks to bilateral posterior legs extending to the knees." (AR 477.) Upon examination, Plaintiff exhibited tenderness in her lumbar spine, limited range of motion, but negative straight leg tests. (AR 478.) Her gait was observed to be slow, guarded, and stooped. (AR 478.) Plaintiff was assessed with lumbar and thoracic spine internal derangement, prescribed pain medication, and recommended to remain on "temporary alternate work status" with restrictions to include no lifting, pushing, or pulling over 10 pounds. (AR 478.)

On December 5, 2014, Dr. Johnson assessed Plaintiff with lumbar spine internal derangement and thoracolumbar spine sprain and strain. (AR 473.) He concluded that Plaintiff would need to be seen for "long-term pain management" and to "continue her modified work profile as recommended." (AR 473.)

### 3. Michael F. Charles, M.D.

On April 15, 2014, Plaintiff underwent a "Comprehensive Agreed Medical-Legal Evaluation" with Dr. Michael F. Charles in connection with Plaintiff's workers compensation claim. (AR 562–70.) She complained of pain located primarily in her upper and lower lumbar regions, with the pain greater in her left side. (AR 564.)

Upon examination, Dr. Charles observed Plaintiff was able to walk on her toes and heels. (AR 564.) He noted tenderness across Plaintiff's lower back and upper lumbar region, with increased pain while squatting, bending, and twisting. (AR 564.) Dr. Charles diagnosed Plaintiff

with "[c]hronic lumbar radiculitis" at the S1 nerve root, "[h]ealing multiple rib fractures" at the lower thoracic lumbar region, and "[p]ersistent spine instability with abnormal motion noted at L2-3 and L5-S1." (AR 566.)

Dr. Charles reviewed Plaintiff's records and concluded she is "restricted to sedentary work, that is, unable to work in a standing position for prolonged periods." (AR 565–69.) Dr. Charles found that Plaintiff "has to stand and sit at will" and "cannot perform any heavy work activities." (AR 569.)

### 4. William von Kaenel, M.D.

On May 9, 2014, pain management specialist Dr. William von Kaenel reviewed Plaintiff's medical records and performed an evaluation in connection with her work-related back injury. (AR 308–12.) She complained of "constant" pain aggravated by sitting, transitions, bending, lifting, standing, and walking. (AR 308.) Plaintiff had no tenderness with palpation and normal muscle strength upon examination. (AR 310–11.) Her straight leg raise test produced pain on the right side. (AR 311.) Dr. von Kaenel diagnosed degenerative spondylolisthesis and disc protrusion at L5-S1, radiculopathy at L5, facet arthropathy, and discogenic pain. (AR 312.)

That same day, Dr. von Kaenel administered a transforaminal epidural steroid injection bilaterally (AR 312–38, 401–405, 517–22), but in June 2014, Plaintiff reported experiencing "no improvement overall." (AR 387.)

On July 9, 2014, Dr. von Kaenel recommended a medial branch blockade for continued pain, and he administered the blockade on July 10, 2014. (AR 344–75, 397–400, 499–506.) On July 22, 2014, Dr. von Kaenel reviewed the success of the branch blockade and determined that Plaintiff experienced 35% pain relief as a result. (AR 384.) He concluded that her pain was discogenic in origin and therefore could not be treated by him. (AR 385.)

In August 2014, Plaintiff completed six physical therapy sessions, but did not respond to the treatment as anticipated and only experienced temporary pain relief post-treatment. (AR 687.)

### 5. Anju Varshney, M.D.

Plaintiff presented to neurosurgeon Dr. Anju Varshney on September 25, 2014, for an evaluation of low back pain. (AR 482–84.) Plaintiff denied radiating pain, numbness, tingling, or

weakness. Plaintiff reported undergoing physical therapy, chiropractic treatment, and lumbar spine injections without much relief or benefit. (AR 482.) Upon examination of Plaintiff's spine, Dr. Varshney noted normal flexion and extension with slightly more pain to extension. (AR 483.) No point tenderness was noted but positive Faber test bilaterally was observed. (AR 483.) Plaintiff's straight leg raise test was negative and her strength and reflexes were normal (AR 483.) Dr. Varshney's impression was lumbar disc degeneration and he recommended bilateral sacroiliac joint injections. (AR 484.) Despite Plaintiff's complaints of persistent pain, Dr. Varshney did "not see any obvious pathology on the radiographs." (AR 483.)

An MRI of Plaintiff's thoracic spine was performed on November 18, 2014. (AR 476.) It showed posterior disk protrusions at T8-9, T9-10, and T11-12. (AR 476.)

### 6. Ricardo Ramos, M.D.

Plaintiff was seen by Dr. Ricardo Ramos on April 15, 2015, for back pain and allergies. (AR 692–96.) Upon examination, Dr. Ramos noted bilateral lower back tenderness on palpation with tightness of her lower back muscles. (AR 695.) Dr. Ramos refilled her pain medication and added a muscle relaxer to her treatment. (AR 695.) He also recommended that she see a pain management specialist. (AR 695.)

On May 12, 2015, Dr. Ramos noted Plaintiff's "back pain is not improving at all." (AR 700.) He indicated he would "try to get [Plaintiff] a walker" as Plaintiff stated she "gets tired easily when she ambulates from her back pain." (AR 700.) That same day, Dr. Ramos prescribed a front-wheel walker with a seat as "medically necessary." (AR 872.)

A June 11, 2015, x-ray of Plaintiff's lumbar spine revealed no significant spondylosis or acute osseous injury. (AR 836.) On September 28, 2015, MRI of the lumbar spine showed "right foraminal disc protrusion . . . displacing the exiting right L4 nerve root in the neural foramina." (AR 721, 825.) An "annulus tear" was also seen "with a central and right paramedian disc protrusion . . . displacing the right S1 root." (AR 721, 825.)

### 7. Rudolph Alvarado, M.D.

Plaintiff complained of back pain on September 4, 2015. (AR 711.) An examination revealed normal range of motion, normal strength, no tenderness, no swelling, no deformity, and

normal gait.  (AR 711, 713.)  On October 21, 2015, Plaintiff presented to Dr. Rudolph Alvarado for mid to lower back pain with contusions and fractured ribs.  (AR 760–62.)  Dr. Alvarado observed Plaintiff had pain and limited range of motion in her back.  (AR 760.)  He refilled medications and referred Plaintiff for physical therapy.  (AR 761–62.)

Plaintiff participated in nine physical therapy sessions from November 17, 2015 through December 30, 2015.  (AR 723–59.)  At the conclusion of the sessions, Plaintiff reported "no change" in her symptoms.  (AR 723.)  She was observed to have "decreased activity tolerance associated with thoracodorsal myofascial strains" and "no tolerance to [exercises] for back care or strengthening."  (AR 723.)  Plaintiff was noted to "respond[] well for short term reduction of pain with TENS unit" and had full muscle strength on assessment.  (AR 723, 726.)

### 8. Dr. Omolade Maurice-Diya, M.D.

On December 14, 2015, Plaintiff presented to pain management specialist Dr. Omolade Maurice-Diya for an "invasive pain management consultation and evaluation."  (AR 715.)  Plaintiff described her pain as located in her lower back, that is constant, burning, throbbing, aching, sharp, and stabbing with numbness.  (AR 715.)  Plaintiff was observed by Dr. Maurice-Diya to be in "some distress due to pain."  (AR 716.)  She had restricted range of motion in her lumbar spine, with tenderness and guarding.  (AR 716.)  Dr. Maurice-Diya noted Plaintiff had bilateral radicular pain and pain with twisting, turning, extension, and flexion.  (AR 716.)  Plaintiff had positive Patrick's and Gaenslen's symptoms.  (AR 716.)

Dr. Maurice-Diya assessed "[c]hronic lower back pain with bilateral radiculopathy secondary to a lumbar disc bulge with nerve root impingement at L4-S1," "[b]ilateral sacroiliac arthropathy," "[b]ilateral facet joint arthropathy," and "status post-physical therapy with temporary relief" and lumbar steroid injections with "no relief."  (AR 716.)  He administered bilateral sacroiliac joint injections, prescribed a back brace and a TENS unit, and recommended home therapy and continued pain management medication.  (AR 716.)  Dr. Maurice-Diya recommended a future neurosurgical referral if Plaintiff's pain persisted.  (AR 716.)

On March 10, 2016, Plaintiff followed up with Dr. Maurice-Diya and reported no relief with injections.  (AR 718.)  She complained of "falling often" with the support of a cane and reported

that her primary care physician had ordered a seated walker for her. (AR 718.) Upon examination, Dr. Maurice-Diya observed tenderness to Plaintiff's lumbar region with rigidity and guarding. (AR 718.) He also noted Plaintiff ambulated with a cane. (AR 718.) In view of the lack of improvement with objections, Dr. Maurice-Diya recommended a neurosurgical referral. (AR 718.)

### 9. Agustin Rubio, M.D.

On December 28, 2015, Plaintiff established care with Dr. Agustin Rubio and complained of chronic pain to her low back that radiates down both legs. (AR 765.) Plaintiff reported that she is "stable" on her medications, as they enable her to "relax" and perform activities of daily living. (AR 765.) Plaintiff stated that she is unable to decrease the dosage of her medications due to severe pain and desired a walker with a seat to perform activities of daily living because a cane "is not enough," given her pain and weakness in both legs. (AR 765.) Dr. Rubio examined Plaintiff's low back and found tenderness to palpation. (AR 765.) Plaintiff also had difficulty with her range of motion at the extremes. (AR 768.) Dr. Rubio ordered refills of medications, including Norco, Soma, and Tramadol. (AR 768.)

Plaintiff followed up with Dr. Rubio on January 28, 2016, for medication refills. (AR 770.) She reported feeling "good" on medications and able to relax and perform some daily living activities. (AR 770.) Plaintiff's back was observed to be tender to palpation. (AR 773.) On February 26, 2016, Plaintiff stated her chronic low back pain was "better" on medications. (AR 775.) Plaintiff also complained of depression, for which Dr. Rubio prescribed Wellbutrin. (AR 775, 778.)

On February 11, 2016, Dr. Rubio completed a physical medical source statement based on his monthly examinations of Plaintiff and treatment for low back pain and degenerative disc disease. (AR 675.) He indicated Plaintiff's symptoms are chronic, she has severe pain in her low back and that she experiences drowsiness and fatigue as a result of her medications. (AR 675.) Dr. Rubio opined Plaintiff could sit and stand/walk each for less than two hours in an 8-hour, competitive work situation workday, and would need unscheduled breaks every 40 minutes. (AR 675.) He further opined Plaintiff could rarely lift and carry less than 10 pounds, never lift and carry 10 pounds or more, and never twist, stoop/bend, crouch/squat, climb stairs, or climb ladders. (AR 675.) Dr.

Rubio concluded that Plaintiff would be off-task or unable to concentrate 25% or more of the time. (AR 675.)

Plaintiff presented to Dr. Rubio on March 28, 2016 for referral to a neurosurgery specialist to address severe low back pain that persisted despite injections. (AR 780.) Plaintiff reported that Wellbutrin cause an increase in anxiety and anger. (AR 780.) Dr. Rubio found Plaintiff's back had tenderness to palpation and poor range of motion. (AR 783.) Dr. Rubio examined Plaintiff again on April 26, 2016, and his findings were unchanged. (AR 812.) On May 24, 2016, and June 21, 2016, he noted Plaintiff's chronic back pain with radiculopathy was "stable." (AR 863, 867.)

On June 24, 2016, x-rays of the cervical spine showed "[r]eversal of physiological cervical lordosis," degenerative disc disease-type changes, and "[m]ultilevel mild spondylosis/disc degenerative disease with no acute fracture or subluxation." (AR 820.) Plaintiff saw Dr. Rubio on July 21, 2016, and August 22, 2016, for chronic back pain with radiculopathy, which she reported as "stable" with medication. (AR 855, 859.) Dr. Rubio again observed poor range of motion in Plaintiff's low back with tenderness to palpation, and refilled her medications. (AR 858, 862-63.)

On August 4, 2016, Dr. Rubio completed another physical medical source statement directed to Plaintiff's physical impairments of back pain, bulging disc, nerve impingements, and degenerative disc disease. (AR 678.) Dr. Rubio opined Plaintiff could walk a half a city block without rest or severe pain and could only sit for 10 minutes and stand for 20 minutes before needing to change positions. (AR 678.) He reiterated that Plaintiff could only sit and stand/walk less than two hours in an 8-hour, competitive work situation workday, and would need unscheduled breaks of 10 minutes hourly. (AR 678–79.)

Dr. Rubio indicated that with prolonged sitting, Plaintiff would require her leg be elevated two feet for 30 percent of the time, and that Plaintiff would need a cane or other hand-held assistive device while engaging in occasional standing/walking due to imbalance, pain, weakness, and insecurity. (AR 679.) Dr. Rubio again found that Plaintiff could rarely lift and carry less than 10 pounds, never lift and carry 10 pounds or more, and never twist, stoop/bend, crouch/squat, climb stairs, or climb ladders. (AR 679.) He opined that Plaintiff could perform manipulative activities with her arms, hands, or fingers only 50 percent of the time. (AR 679–80.)

Dr. Rubio further found that Plaintiff is incapable of even "low stress" work due to pain and depression and is likely to be absent from work due to her impairments more than four days per month. (AR 680.) He opined that Plaintiff is incapable of walking on uneven surfaces, using standard public transportation, carrying out routine activities, and climbing several stairs without companion assistance. (AR 680.)

On October 21, 2016 Plaintiff was seen by Dr. Rubio for low back pain and neck pain with radiculopathy. (AR 848.) She also requested medication for weight loss, reporting that she walks and does work "all day long" but is unable to lose weight on her own. (AR 848.) Plaintiff followed up with Dr. Rubio on December 21, 2016, complaining of "more pain to her neck that radiates down to her bilateral arms." (AR 843.)

On February 14, 2017, Dr. Rubio administered a B-12 shot for chronic fatigue, which helped Plaintiff with her energy and strength. (AR 838.) Examination of Plaintiff's back was unchanged, with tenderness to palpation and poor range of motion. (AR 842.) Dr. Rubio continued pain medications, including Norco, Tramadol, and Soma, and also encouraged Plaintiff to exercise and to perform range of motion movements. (AR 842.)

On March 14, 2017, Dr. Rubio completed a third physical medical source statement addressing Plaintiff's low back pain, neck pain, and degenerative disc disease. (AR 816.) He identified disc protrusion and nerve impingement as Plaintiff's pertinent clinical findings and objective signs. (AR 816.) Dr. Rubio reiterated his opinion that Plaintiff could walk a half a city block without rest or severe pain and could only stand for 20 minutes before needing to change positions. (AR 817.) Dr. Rubio found that Plaintiff could sit for 45 minutes before needing to get up. (AR 817.) He again opined that Plaintiff could only sit and stand/walk less than two hours in an 8-hour, competitive work situation workday, and would need unscheduled breaks of 20 minutes hourly. (AR 817.)

Dr. Rubio indicated that with prolonged sitting, Plaintiff would require her leg be elevated two feet for 50 percent of the time due to pain, and that Plaintiff would need a cane or other hand-held assistive device while engaging in occasional standing/walking due to imbalance, pain, and insecurity. (AR 817.) Dr. Rubio again found that Plaintiff could rarely lift and carry less than 10

pounds, never lift and carry 10 pounds or more, and never twist, stoop/bend, crouch/squat, climb stairs, or climb ladders.  (AR 818.)  He opined that Plaintiff could perform manipulative activities with her arms, hands, or fingers only 20 percent of the time.  (AR 818.)

Dr. Rubio further found that Plaintiff is capable of low stress work and is likely to be absent from work due to her impairments more than four days per month.  (AR 818.)  According to Dr. Rubio, Plaintiff would be off task more than 25% of the workday.  (AR 818.)

### 10.    J.R. Grandhe, M.D.

Plaintiff presented to pain management specialist Dr. J.R. Grandhe on January 20, 2016, for a TENS evaluation for low back pain.  (AR 719.)  Plaintiff reported good relief of her back pain with use of the TENS unit and "some support" with use of a back brace.  (AR 719.)  Upon examination, Dr. Grandhe noted Plaintiff, who used a cane to ambulate, had tenderness in her lumbar region, as well as paraspinal tenderness, rigidity, and guarding.  (AR 719.)  He also found bilateral trigger points present in Plaintiff and sacroiliac tenderness.  (AR 719.)  Dr. Grandhe administered bilateral lumbosacral trigger point injections due to the severity of pain and recommended bilateral transforaminal lumbar epidural steroid injections, home therapy, and use of a back brace.  (AR 719.)

### 11.    State Agency Physicians

On May 22, 2015, G. Bugg, M.D., a Disability Determinations Service medical consultant, assessed Plaintiff's residual functional capacity (RFC)[4] and found that, taking into account her back pain, lumbar spondylosis, decreased range of motion, and slow gait, Plaintiff could (1) occasionally lift and/or carry 20 pounds and frequently 10 pounds; (2) stand and/or walk for about six hours in an eight-hour workday; (3) sit for about six hours in an eight-hour workday; and (4) perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions.  (AR 77–79.)  Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel,

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

crouch, and crawl, and had no manipulative, visual, communicative, or environmental limitations. (AR 79–80.) Dr. Bugg found that Plaintiff should never climb ladders, ropes, or scaffolds. (AR 79.)

Upon reconsideration on July 31, 2015, another Disability Determinations Service medical consultant, L. Bobba, M.D., affirmed Dr. Bugg's RFC findings, with the exception of the finding that Plaintiff could occasionally climb ladders, ropes, and scaffolds. (AR 90–91.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on May 22, 2015, and again on reconsideration on August 4, 2015. (AR 111–115, 119–124.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 125–37.)

On March 27, 2017, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 41–58.) Plaintiff testified that she experiences chronic pain in her back and pain and muscle spasms in her back. (AR 44–45.) She testified that the pain radiates down to her knees, causing her to "almost fall down." (AR 45.) She currently uses a walker, and, before that, used a cane to ambulate. (AR 45, 48.) Prior to using those devices, she had not any falls because she was "next to something to hold onto." (AR 49.) According to Plaintiff, her pain level is always "between a ten and a[n] eight" and that she "can't [] do anything anymore." (AR 54, 56.)

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a cashier wrapper, Dictionary of Operational Titles (DOT) code 211.462-018, which was light exertional work with a specific vocational preparation (SVP)[5] of 3, and as a sales clerk, DOT code 290.477-014, which was medium exertional work as performed (customarily performed as light) with a SVP of 3. (AR 59–60.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with her work background. (AR 76.) The VE was also to assume this person could perform a range of light work defined having the ability to: lift and carry 20 pounds occasionally and 10 pounds

---

[5] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

frequently; sit, stand, and/or walk for six hours in an eight-hour workday; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes, and scaffolds. (AR 60–61.) The VE testified that such a person could perform Plaintiff's past relevant work. (AR 61.)

In a second hypothetical, the ALJ asked the VE to consider all of the same limitations as in the first hypothetical, but where the individual is to be afforded the option to alternate a sitting or standing position every hour for five minutes and where the individual can perform work that permits the use of a cane for ambulation of distances of one hundred feet or more. (AR 61–62.) The VE testified, based on her expertise, that such a person could not perform Plaintiff's past relevant work, but could perform other, light jobs in the national economy for which a person could alternate positions, such as casher II, DOT code 211.462-010 with a SVP of 2, and a ticket seller, DOT code 211.467-030 with a SVP of 2. (AR 62.)

The ALJ posed a third hypothetical to the VE of an individual who can perform a range of sedentary work defined as lifting and carrying 10 pounds occasionally and five pounds frequently; standing and/or walking for two hours in an eight-hour day; sitting for six hours in an eight-hour workday; alternating the sit/stand position every hour for five minutes; and use of a cane to ambulate distances of 100 feet or more. (AR 62–63.) The VE testified that, in her experience, such a person could not perform Plaintiff's past relevant work, but could perform other, semi-skilled jobs in the national economy, such as telephone solicitor, DOT code 299.357-014, and microfilm/scanning document preparer, DOT code 249.587-014 with a SVP of 2. (AR 63–64.)

In a fourth hypothetical, the ALJ posed to the VE an individual who can perform a range of sedentary work that would permit elevation of the lower extremities two feet from the ground 30% of an eight-hour workday; would permit alternate sitting, standing, and walking positions every 20 minutes; would permit a cane for balance; and where the individual will be off task 25% of the workday and will miss four days a month. (AR 65.) The VE testified that there would be no work that such individual could perform. (AR 65.)

Plaintiff's attorney asked the VE, in a fifth hypothetical, whether an individual in the third hypothetical who would need to use a walker for ambulation and balance, would need to alternate

sitting and standing every twenty minutes for five minutes, and be limited to simple and routine tasks could perform any work in the national economy.  (AR 68–69.)  The VE testified that such an individual could not perform other jobs that are not sedentary.  (AR 69–70.)

**C.     The ALJ's Decision**

In a decision dated May 31, 2017, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 18–28.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520.  (AR 20–28.)  The ALJ decided that Plaintiff had not engaged in substantial gainful activity since November 21, 2015, the alleged onset date (step one).  (AR 20.)  At step two, the ALJ found Plaintiff's following impairments to be severe: "status post rib fractures"; "degenerative disc disease of the lumbar spine with facet arthrosis, a foraminal disc protrusion at L4-L5, and an annulus tear at L5-S1"; and "disc protrusions in the thoracic spine, status post a 'minimal compression fracture' of T12-L1."  (AR 20–21.)  Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the Listings (step three).  (AR 21–22.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and five.  *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . .  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff retained the RFC:

> to perform a range of work at the light exertional level as defined in 20 CFR 404.1567(b).  Specifically, she can lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk six hours in an eight-hour workday and sit six hours in an eight-hour workday.  She can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but should never climb ladders, ropes, or scaffolds.  In addition, [Plaintiff] can perform work which permits use of a cane to ambulate distances of 100 feet or more, and which permits alternating between sitting and standing every hour for five minutes.

(AR 22.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record."  (AR 26.)  The ALJ found that Plaintiff could not perform her past relevant work (step four), but that, on the basis of the RFC assessment, she retained the capacity to perform other work that existed in sufficient numbers in the

national economy, including the jobs of cashier II and ticket seller (step five).  (AR 26–28.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on April 20, 2018.  (AR 1–6.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.

### III.  LEGAL STANDARD

#### A.  Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*,

1   180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

2       "The claimant carries the initial burden of proving a disability in steps one through four of

3   the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir.

4   1989)). "However, if a claimant establishes an inability to continue her past work, the burden shifts

5   to the Commissioner in step five to show that the claimant can perform other substantial gainful

6   work." *Id.* (citing *Swenson*, 876 F.2d at 687).

7   **B.      Scope of Review**

8       "This court may set aside the Commissioner's denial of disability insurance benefits [only]

9   when the ALJ's findings are based on legal error or are not supported by substantial evidence in the

10  record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence is defined

11  as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d

12  1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial

13  evidence is such relevant evidence as a reasonable mind might accept as adequate to support a

14  conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

15      "This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec.*

16  *Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by

17  inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir.

18  2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the

19  evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at

20  1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not

21  substitute its judgment for that of the Commissioner." (citations omitted)).

22      Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a

23  specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*,

24  143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole,

25  weighing both evidence that supports and evidence that detracts from the [Commissioner's]

26  conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

27      Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless."

28  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*,

454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.     DISCUSSION

Plaintiff contends, in relevant part, that the ALJ erred during the RFC analysis when determining the weight to accord to the opinions of Plaintiff's treating physician, Dr. Rubio.  (*See* Doc. 16 at 14–15; Doc. 21 at 2–3.)  For the reasons that follow, the Court agrees with Plaintiff's position.

### A.     The ALJ Erred in Her Evaluation of Dr. Rubio's Opinions

#### 1.     Overview of Analysis

The ALJ determines a claimant's RFC before step four of the sequential evaluation analysis. *See, e.g.*, 20 C.F.R. § 404.1520(e).  A claimant's RFC "is the most [the claimant] can still do despite [their] limitations." *Id.* § 404.1545(a)(1).  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record . . . ." *Robbins*, 466 F.3d at 883.  "The ALJ is entitled to formulate an RFC and resolve any ambiguity or inconsistency in the medical evidence . . . ." *Jenkins v. Colvin*, Case No. 1:15-cv-01135-SKO, 2016 WL 4126707, at *6 (E.D. Cal. Aug. 2, 2016) (citing *Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001)).  Additionally, "[t]he ALJ can . . . decide what weight to give to what evidence as long as the ALJ's reasoning is free of legal error and is based on substantial evidence." *Tremayne v. Astrue*, No. CIV 08–2795 EFB, 2010 WL 1266850, at *12 (E.D. Cal. Mar. 29, 2010) (citing *Reddick v. Chater*, 157 F.3d 715 (9th Cir. 1998)).

"In disability benefits cases such as this, physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work." *Reddick*, 157 F.3d at 725.  Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining [or reviewing] physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

"Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)). The opinions of treating physicians "are given greater weight than the opinions of other physicians" because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (citations omitted).

In this case, Plaintiff alleges—and the record reflects—that Dr. Rubio was Plaintiff's treating physician. (*See, e.g.*, Doc. 16 at 14.) "If . . . a treating [physician's] opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record, [the Commissioner] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2); *cf. Reddick*, 157 F.3d at 725 ("Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for clear and convincing reasons supported by substantial evidence in the record." (citation omitted)). "If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.'" *Orn*, 495 F.3d at 632 (quoting 20 C.F.R. § 404.1527(d)(2)).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Commissioner] considers specified factors in determining the weight it will be given." *Id.* at 631. These factors include (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the "[s]upportability" of the opinion;" (4) the "[c]onsistency" of the opinion "with the record as a whole;" (5) whether the opinion is from "a specialist about medical issues related to his or her area of specialty;" and (6) "any other factors [the claimant] or others bring to [the ALJ's] attention, or of which [the ALJ is] aware, which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(2)–(6).

Further, "[e]ven if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick*, 157 F.3d at 725 (quoting *Lester*, 81 F.3d at 830). *See also Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)); *see, e.g.*, *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." (quoting *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009))); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995))); *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (noting that "inconsistencies and ambiguities" in a treating physician's opinion "represent specific and legitimate reasons for" rejecting the opinion). "The ALJ must do more than offer his conclusions." *Reddick*, 157 F.3d at 725. "He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citing *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988)).

Finally, "[e]ven when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is 'still entitled to deference.'" *Orn*, 495 F.3d at 632–33 (quoting SSR 96–2p). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* (quoting SSR 96–2p).

### 2. Analysis Regarding Plaintiff's Treating Physician Dr. Rubio

Dr. Rubio opined in 2016 and 2017 that Plaintiff is capable of less than the full range of sedentary work, with inability to sit, stand, or walk for prolonged periods, that she needs assistive devices and additional breaks, she would be off-task 25% of the day, and she would be absent from

work at least four times monthly. (AR 675 (February 11, 2016 physical medical source statement), AR 678–80 (August 4, 2016 physical medical source statement), AR 816–18 (March 14, 2017 physical medical source statement).) Although not specifically identified by the ALJ as a basis for its rejection, Dr. Rubio's opinions are contradicted by the medical opinion evidence of Disability Determinations Service medical consultants Drs. Bugg and Bobba, who opined that Plaintiff could sit, stand and/or walk for about six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and had no manipulative, visual, communicative, or environmental limitations. (AR 77–80, 90–91.) Thus, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting Dr. Rubio's opinions.

Here, the ALJ gave Dr. Rubio's opinions "little weight" because "they are inconsistent with the medical and other evidence." (AR 24.) Plaintiff contends that this rationale does not constitute the requisite "specific and legitimate reason" to accord Dr. Rubio's opinions reduced weight and reach a disability determination that is contrary to this treating source's opinion. (See, e.g., Doc. 16 at 14–15; Doc. 21 at 2–3.) The Court agrees.

The ALJ noted the following evidence that conflicted with Dr. Rubio's opinions[6]: (1) a physical therapy discharge summary dated December 30, 2015, showing "full muscle strength"; (2) Dr. Rubio's treatment records dated May 24 and June 21, 2016, indicating Plaintiff's condition is "stable"; and (3) an examination of Plaintiff's musculoskeletal system performed on September 4, 2015, showing "a normal range of motion with normal strength, no tenderness, no swelling, and no deformity in the extremities." (AR 24.) However, in noting this evidence, the ALJ ignored contrary evidence that supported Dr. Rubio's opinions, including that Plaintiff (1) experienced muscle weakness in her legs, *see, e.g.*, AR 765 (treatment note of Dr. Rubio dated December 28,

---

[6] The ALJ also found Dr. Rubio's opinions "inconsistent with the conservative treatment Plaintiff has received." (AR 24.) Although a conservative treatment plan can be the basis for rejecting a treating physician's medical opinion, the ALJ did not adequately specify what of Plaintiff's treatment she found "conservative," nor did she explain how Dr. Rubio's opinions regarding functional limitations were undermined by such treatment. *Cf. Garrison*, 759 F.3d at 1015 (casting doubt on characterizing epidural injections and physical therapy as "conservative treatment"). Without a more informative explanation by the ALJ, this reason is neither "specific" nor "legitimate" to warrant rejection of Dr. Rubio's opinions. *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) (quoting 42 U.S.C. § 405(b)(1) ) ("Finding that an ALJ's failure to explain his reasoning 'falls short of meeting the ALJ's responsibility to provide a discussion of the evidence" and 'the reason or reasons upon which his adverse determination is based.'"); *Lester*, 81 F.3d at 830.

2015, which states Plaintiff "has weakness to both legs"), AR 770 (treatment note of Dr. Rubio dated January 28, 2016, which states that Plaintiff has "leg weakness [in bilateral] legs" and "legs give out at time[s] patient has had a fall recently"), AR 718 (treatment note of pain management specialist Dr. Maurice-Diya dated March 10, 2016, which stated that Plaintiff was "falling often" with the support of a cane and that "her primary care physician had ordered a seated walker for her"), AR 838 (treatment record of Dr. Rubio dated February 14, 2017, which states Plaintiff "received B-12 shot [that] helps with energy and strength"); (2) was noted to be "stable" only because she was continuing to take Norco, Soma, and Tramadol, the dosages of which she was unable to decrease because of severe and chronic back pain, *see, e.g.*, AR 476 (MRI of Plaintiff's thoracic spine performed on November 18, 2014, which showed posterior disk protrusions at T8-9, T9-10, and T11-12), AR 721, 825 (MRI of Plaintiff's lumbar spine performed September 28, 2015, which showed "right foraminal disc protrusion . . . displacing the exiting right L4 nerve root in the neural foramina" and an "annulus tear . . . with a central and right paramedian disc protrusion . . . displacing the right S1 root"), AR 863 (treatment record of Dr. Rubio dated June 21, 2016, which states Plaintiff's is "on meds and is stable on norco and soma and tramadol" but that she "continues to have severe pain requir[ing] medications" and "[i]sn't able to decrease the dose of the medication because of severe pain"); AR 867 (treatment record of Dr. Rubio dated May 24, 2016, which states same), AR 829 (X-ray of Plaintiff's cervical spine performed June 24, 2016, which showed "[r]eversal of physiological cervical lordosis," degenerative disc disease-type changes, and "[m]ultilevel mild spondylosis/disc degenerative disease"), AR 838 (treatment record of Dr. Rubio dated February 14, 2017, which states Plaintiff "continues to have severe pain require[ing] medications"); and (3) presented with medical findings demonstrating limited range of motion and tenderness (*see, e.g.*, AR 760 (record of treating physician Dr. Alvarado dated October 21, 2015, which shows Plaintiff had pain and limited range of motion in her back), AR 716 (treatment note of Dr. Maurice-Diya dated December 14, 2015, which shows that Plaintiff had restricted range of motion in her lumbar spine, with tenderness and guarding), AR 719 (treatment note of pain management specialist Dr. Grandhe dated January 20, 2016, which shows tenderness in Plaintiff's lumbar region, paraspinal tenderness, rigidity, guarding, bilateral trigger points, and

sacroiliac tenderness), AR 858, 862-63 (treatment notes of Dr. Rubio dated July 21 and August 22, 2016, which showed poor range of motion in Plaintiff's low back with tenderness to palpation), AR 842 (treatment record of Dr. Rubio dated February 14, 2017, which showed tenderness to palpation and poor range of motion in Plaintiff's back).

An ALJ may properly discount a treating physician's opinion that is inconsistent with the medical record, including his own findings. *See Valentine*, 574 F.3d at 692–93. However, in so doing, an ALJ may not consider evidence that only supports the non-disability determination, while disregarding evidence that supports the contradictory opinion from a physician. *See, e.g.*, *Holohan*, 246 F.3d at 1207 (finding that "the ALJ's specific reason for rejecting [a physician's] medical opinion [was] not supported by substantial evidence" because, in part, "the ALJ selectively relied on some entries in [the plaintiff's] records . . . and ignored the many others that indicated continued, severe impairment"); *see also Reddick*, 157 F.3d at 722–23 (An ALJ may not "cherry pick" from a record to support the conclusion, but rather must account for the context of the whole record.). *See generally Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) ("Although it is within the power of the [ALJ] to . . . weigh conflicting evidence, he cannot reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result." (citations omitted)). Here, the ALJ impermissibly selected evidence that was contrary to Dr. Rubio's opinions and, in the process, ignored the entire longitudinal record. *See Attmore v. Colvin*, 827 F.3d 872, 875 (9th Cir. 2016) ("We cannot affirm, however, by isolating a specific quantum of supporting evidence, but must consider the record as a whole"); *Holohan*, 246 F.3d at 1205 (noting a treating physician's statements must be read in context of the overall diagnostic picture he draws). The Court therefore finds that the ALJ's citation to medical evidence is not a specific and legitimate reason to discount the opinion of this treating physician.

### 3. Harmless Error Analysis

The Court must next address whether the ALJ's analysis pertaining to Dr. Rubio's opinions was harmless error. *See, e.g.*, *Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) (holding that the "harmless error analysis applies . . . to assess the impact of the ALJ's failure to even mention [a treating physician] or [his] notes, let alone its failure to give specific and legitimate reasons that are

supported by substantial evidence for rejecting a treating source's medical opinion" (citation omitted)).  The Ninth Circuit "ha[s] long recognized that harmless error principles apply in the Social Security Act context." *Molina*, 674 F.3d at 1115 (citing *Stout*, 454 F.3d at 1054).  As such, "the court will not reverse an ALJ's decision for harmless error." *Tommasetti*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citing *Robbins.*, 466 F.3d at 885).  An error is harmless "where it is inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115 (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (stating that an error is also harmless "'if the agency's path may reasonably be discerned,' even if the agency 'explains its decision with less than ideal clarity'" (quoting *Alaska Dep't of Envtl. Conservation. v. EPA*, 540 U.S. 461, 497 (2004))).  "In other words, in each case [courts] look at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115.  "[T]he nature of [the] application" of the "harmless error analysis to social security cases" is "fact-intensive—'no presumptions operate' and '[courts] must analyze harmlessness in light of the circumstances of the case.'" *March v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) (quoting *Molina*, 674 F.3d at 1121).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

In this case, the ALJ's erroneous analysis pertaining to Dr. Rubio was not harmless.  Dr. Rubio opined that Plaintiff is capable of less than the full range of sedentary work; could rarely lift and carry less than 10 pounds; never lift and carry 10 pounds or more; is unable to sit, stand, or walk for prolonged periods; needs assistive devices and additional breaks; would be off-task 25% of the day; and would be absent from work at least four times monthly.  (AR 675, 678–80,816–18.)  However, the ALJ found that Plaintiff had an RFC to perform light work, with some limitations.  (AR 22.)  This finding is irreconcilable with Dr. Rubio's opinions. *Compare* 20 C.F.R. § 404.1567(b) (stating that "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "requires a good deal of walking or standing, or . . . involves sitting most of the time with some pushing and pulling of arm or leg controls"), *with* (AR 675, 678–80,816–18 (providing Dr. Rubio's opinions).)  As such, if the

ALJ credited Dr. Rubio's opinions, the ALJ's RFC determination—and likely the outcome of the decision—would be different. (*See, e.g.*, AR 65 (According to the VE, no work is available for an individual who has the RFC to perform a range of sedentary work that would permit elevation of the lower extremities two feet from the ground 30% of an eight-hour workday; would permit alternate sitting, standing, and walking positions every 20 minutes; would permit a cane for balance; and where the individual will be off task 25% of the workday and will miss four days a month).)

The Court therefore finds that the ALJ's error was not harmless. *See, e.g.*, *Molina*, 674 F.3d at 1115 (noting that an error is harmless "where it is inconsequential to the ultimate nondisability determination" (citations omitted)).

**B.     The ALJ's Error Warrants Remand for Further Proceedings**

In his briefing, Plaintiff argues that "further administrative proceedings would not be useful" and, instead, the Court should credit the opinions of Plaintiff's treating physicians as true and order the payment of benefits. (Doc. 19 at 31–32; *see also id.* at 34 (arguing that the Court should credit lay testimony as true).) The Court disagrees and finds that an order for payment of benefits is inappropriate.

Where the ALJ commits an error and that error is not harmless, the "ordinary . . . rule" is "to remand to the agency for additional investigation or explanation." *Treichler*, 775 F.3d at 1099 (citations omitted). The Ninth Circuit recognized a limited exception to this typical course where courts "remand[] for an award of benefits instead of further proceedings." *Id.* at 1100–01 (citations omitted); *see also id.* at 1100 (noting that this exception is "sometimes referred to as the 'credit-as-true' rule"). In determining whether to apply this exception to the "ordinary remand rule," the court must determine, in part, whether (1) "the record has been fully developed;" (2) "there are outstanding issues that must be resolved before a determination of disability can be made;" and (3) "further administrative proceedings would be useful." *Id.* at 1101 (citations omitted). As to the last inquiry, additional "[a]dministrative proceedings are generally useful where the record has not been fully developed, there is a need to resolve conflicts and ambiguities, or the presentation of further evidence . . . may well prove enlightening in light of the passage of time." *Id.* (citations omitted). Ultimately, "[t]he decision whether to remand a case for additional evidence or simply to award

benefits is in [the court's] discretion." *Swenson*, 876 F.2d at 689 (citation omitted).

Having found that the ALJ failed to articulate specific and legitimate reasons, supported by substantial evidence, for rejecting the opinion of Plaintiff's treating physician, the Court finds that the "credit-as-true" exception to the "ordinary remand rule" is inapplicable because additional administrative proceedings will be useful. In particular, the ALJ's RFC determination conflicted with the opinion evidence of Dr. Rubio—as well as other testimony in the record. As Plaintiff concedes (*see* Doc. 21 at 6), the error identified above can be remedied with further proceedings to accord an opportunity to the ALJ to resolve this conflict. *Cf. Dominguez v. Colvin,* 808 F.3d 403, 408–09 (9th Cir. 2016); *Lule v. Berryhill*, Case No.: 1:15-cv-01631-JLT, 2017 WL 541096, at *6 (E.D. Cal. Feb. 10, 2017) ("When there is conflicting medical evidence, 'it is the ALJ's role to determine credibility and to resolve the conflict.'" (quoting *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984))). On remand, the ALJ should address this error by properly evaluating the medical evidence, including the opinions of Plaintiff's treating and examining source, and re-assessing Plaintiff's functional limitations in light of that evaluation and the other medical evidence of record.

Accordingly, the Court shall remand this matter for further proceedings.

**C.    The Court Declines to Determine Plaintiff's Remaining Assertions of Error**

As the Court finds that remand is appropriate for the ALJ to reconsider the medical opinion evidence and re-assess Plaintiff's RFC, the Court does not reach Plaintiff's additional assertions of error regarding the ALJ's evaluation of other medical opinions. (*See* Doc. 16 at 13–16; Doc. 21 at 4–6); *cf. Newton v. Colvin*, No. 2:13–cv–2458–GEB–EFB, 2015 WL 1136477, at *6 n.4 (E.D. Cal. Mar. 12, 2015) ("As the matter must be remanded for further consideration of the medical evidence, the court declines to address plaintiff's remaining arguments."); *Willmett ex rel. A.P. v. Astrue*, No. 2:10–cv–01201 KJN, 2011 WL 3816284, at *1 (E.D. Cal. Aug. 25, 2011) ("Because this legal error warrants remanding this matter for further proceedings, the undersigned does not reach the remainder of [the] plaintiff's arguments seeking reversal of the ALJ's and Appeals Council's decisions.").

## V.    CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by

substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further proceedings consistent with this Order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Diana Torres Aparicio and against Defendant Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **April 13, 2019**                                    /s/ *Sheila K. Oberto*
                                                                    UNITED STATES MAGISTRATE JUDGE